All rise. Court is in session. Please be seated. Madam Clerk, will you please call the final case. I would like for the attorneys to step up to the podium. Tell the court your name, who you represent, and approximately how long your argument will take. 12-045-8 Northwest Podiatry Center, Ltd. v. Gregory Brniska v. Gary Ochwat and Craig Halian. Good morning, Counsel. Good morning, Your Honor. Robert Lang for the appellants, Drs. Gary Ochwat and Craig Halian. Good morning, Your Honors. Gary Hollander for the plaintiff, Apolise, Dr. Gregory Brniska, and the entity we call NPC, Northwest Podiatry Center, Ltd. Very good. Mr. Lang, will you please proceed with your argument. How long do you plan to argue? Fifteen minutes and then maybe reserve five for rebuttal, if possible. Okay. Mr. Hollander? I'll take a comparable amount of time, if that's okay. You mean fifteen minutes? Okay. Okay, very good. Proceed. Okay. Just to be clear, is that fifteen plus five, or? No, he just gets fifteen. Okay, thank you. He can get twenty total, but he doesn't get any rebuttal. But proceed. The facts of the case are not too complex as far as this appeal. We're not trying to get into the credibility issues and so forth. My clients left NPC, the practice group that's at issue here, on June 30, 2010, to start working for their own practice group. On that very day, the trial court entered a temporary restraining order, which was granted in part on the plaintiff's motion. And in that temporary restraining order, my clients were enjoined from treating those who were NPC patients for a specific time period, January 1, 2009, through June 30, 2010, the day they left. Then actually, on August 12, 2010, when the plaintiff's had my client sign an employment agreement in hand, again, only one of my clients does have an employment agreement, Dr. Halahan. Dr. Aqued, who was a shareholder, did not have an employment agreement or any written restrictive covenants. That's because NPC shareholders didn't have restrictive covenants. On August 12, 2010, the trial court denied the plaintiff's motion for temporary restraining order to enforce that Dr. Halahan employment agreement. And then thereafter, we started the preliminary injunction hearing on September 1, 2010. It was done on June 1, 2011, and the ruling came down on January 17, 2012. So we sit here almost three years after my clients left NPC, which I do think factors into a couple of our arguments. I wanted to get through four points here today. First, the so-called privileges restriction, that's an ambiguous clause in this Dr. Halahan's employment agreement. Judge Pantley herself found that the clause was ambiguous, and where we think she went wrong was taking parole evidence and enforcing it anyway. The second point is whether Dr. Halahan's employment agreement had expired or terminated before, I'm sorry, was extended before it had terminated on August 31, 2009. We say that the evidence shows that it was not. The third point I'd like to get through is there's two vague injunctions. One is our clients were enjoined from doing any business with an HMO that's called the Northwest Suburban IPA without any time limitation whatsoever. And also, our clients were enjoined from seeing any NPC patients without any time restrictions or geographic restrictions whatsoever, and compare that to the TRO where there was a specified time period. And then the last point I'd like to talk about is Judge Pantley basically refused to consider the fact that the practice group was profitable by the time we got to trial on this through June 1, 2011, and that it should have borne irreparable harm or whether it was continuing. So moving on to the first point, whether the privileges restriction was enforceable, again, the trial court found that this restriction was ambiguous as written. When you look at paragraph 9 of Dr. Halahan's employment agreement, there's three separate restrictive covenants. One is that Dr. Halahan was not to practice medicine within five miles of an NPC office, and the NPC did have six offices as opposed to where doctors had privileges for a period of three years. And that five miles and three-year limitations, they were both specifically stated in that clause. Getting right to the issue, the fact is in the privileges, it doesn't say anything about geographic or temporal restrictions. So it's in the other sentences. It's not there. Correct. And so the judge had a hearing to determine what should have been. Now, first of all, is there any blue-pencil provision in the agreement? There is a blue-pencil provision, but we don't think that the court should blue-pencil because it would be supplying a missing term, such as time and geographic limitations. So the law is pretty clear that we're not going to make a contract for the parties that they didn't make in the first place. Okay. And then as far as the law is concerned, that a judge can have a hearing or can reduce if it's too broad, the judge can rewrite, correct? In certain circumstances, if, let's say, they said a 50-mile radius, I mean, if it's a little too far, then it's not good at all either. But there is a point where a judge can rewrite. Correct. But this wasn't rewriting, was it? Correct. It was supplying a new term. So, yes, if it said 15 miles and the trial court thought that was too broad, the judge could write that down to 10 miles. But there was nothing to start with here. Are there any cases where a judge has, in a situation like this, has actually added geographic and temporal requirements where they're totally absent? No. Not that I could see. In fact, the October v. Shaw case, that was a case where it was almost a privilege-type restriction where the judge or, I'm sorry, the appellate court said that this restriction has no time limitation, could go on forever, and we're not going to supply time now. They didn't agree to it in the first place. So when you look at the privileges restriction, and actually when you even look at the privileges injunction, Judge Pantley did find that the three-year temporal limitation should apply to it. But when you look at the meat of her order where she says the court will enter the following relief, there was no three-year limitation placed on that injunction. And there was a three-year limitation placed on another injunction, so it wasn't just that it was a preliminary injunction and that wasn't necessary. It was just not in there. The deck is stacked against the privileges restriction. You know the law on injunctions. They're extraordinary relief. This is a mandatory injunction, so they're even more disfavored. We're to strictly construe restrictive covenants against the employer. Pursuant to that Madigan case that we cited, an injunction will not be granted on an ambiguous covenant. That's it. And also we have the rule of contra preferentum because NPC drafted this employment agreement. If we get through all these ties, so to speak, it still goes to Dr. Hallahan. And then our ultimate fallback is if you're going to enforce the privileges restriction, you've got to enforce it as Dr. Berniska testified. He's the one that supplied the parole evidence, and he testified that not only the three years applies but also the five miles. And when we're talking about the privileges restriction, there are ten restricted facilities. Only two of those, Holy Family and St. Alexis, were within five miles. So at best it's just two facilities at the end of the day. Moving on to the second issue as to whether the Hallahan employment agreement was extended, the question here was, was there a meeting of the minds between Dr. Berniska and Dr. Hallahan to extend this agreement prior to August 31, 2009? It's undisputed that the commencement date of this employment agreement was September 1, 2006, and that's the latest date and the light most favorable to the plaintiffs, and it has an explicit three-year term. Judge Pantley found that Dr. Hallahan extended this agreement prior to August 31, 2009 with a nod. But when you look at the evidence, I don't even think a nod is enough. It's not a meeting of the minds. But when you look at the evidence, that's not what Dr. Berniska testified to. On cross-examination, he was asked whether there was ever a specific time prior to August 31, 2009 that he and Dr. Hallahan discussed the extension of the employment agreement and agreed to that. He said no, clearly said no. And as further proof of that, in December of 2009 at the NPC holiday party, Dr. Berniska announced Dr. Hallahan to the NPC staff to be a partner of NPC. And again, NPC partners did not have employment agreements. They did not have restrictive covenants. But he didn't become a partner? He did not become a partner, correct. I didn't even know that. Well, the point I'm trying to make is that there was no meeting of the minds on or before August 31, 2009 when one of the parties to the alleged agreement, the alleged extension, is saying that the other is a partner and not subject to the employment agreement as of December 2009. And we cite the Bisla and Marhala cases for the proposition that once an employment agreement is expired, if it does expire before the employee leaves the practice group, it's non-enforceable. It's terminated. In the Bisla case, the facts are on point. In that case, there was an employment agreement that said that the doctor employee was to be offered a partnership after three years. The doctor ended up turning the partnership down after three years but kept working for the practice group as an employee. And when he went to compete, the practice group said, hey, look, he's still working for us as an employee. He's working under the employment agreement. And the appellate court said, no, the employment agreement had expired before he left, before he competed. It's not enforced anymore. Moving on to the third issue about these overbroad injunctions. First we'll talk about the IPA injunction. Again, IPA is an HMO. And my clients were enjoined from doing any business with the IPA in the preliminary injunction without any time limitation. And, again, as to this, what I call the NPC patient injunction, my clients were prohibited from treating any current or former patients of NPC. Now, NPC is 34 years old. So if a patient saw NPC in 1978, hasn't seen him since, they want to try to see my clients today, they couldn't do it under the wording of this order. And, again, Judge Pantley, when she entered the TRO, she did put this 18-month period. And reading from the record, I won't read it verbatim, but she said there should be some time constraints on this. I do think we need to put a time parameter on it. I think 18 months would be reasonable. It seems to me that if people are really pursuing a particular doctor, that they usually see that doctor every 6 to 12 months. So I think 18 months would be reasonable. She just forgot. I think that's what happened. She forgot to put any time restriction in the preliminary injunction order. She had it in the TRO. But you didn't go in for reconsideration in light of her statement? No, we didn't. We didn't. We filed a notice of appeal the very next day, I believe, on January 18, 2012. But you could have if you had wanted to. We could have, but we did not. Your Honor, because there were so many other issues with the order, we thought we wanted to get it going on 307A. So under the law, ambiguous injunctions, just like ambiguous restrictive covenants, are unenforceable, and that's as a matter of law. Also, as to this NPC patient injunction, as I said, one of my clients, Dr. Aquit, had no written restrictive covenant or any oral restrictive covenant, for that matter, with the practice group. But what Judge Pantley did was she imposed, she essentially imposed a restrictive covenant on him. And in looking at the law, we take the position in our papers that you can't have an enforceable oral restrictive covenant. In looking at the cases, I don't know. I would have to retract that to some extent. I think under the Lawler case and some other cases, there's a very limited ability for the court to essentially oppose a restrictive covenant, an employee who didn't have one in the first place, and that's to protect trade secrets. Where the employee did take trade secrets, we're going to impose an injunction on him or her for a certain time period. I would submit two things, however, in this case. One, there's been no proof of any theft of trade secrets. There's no Trade Secrets Act claim. And two, that principle, even if you're going to impose a restrictive covenant where there is none, it should be subject to the same reasonableness standards, such as time and geographic limitations that a written restrictive covenant would have. One other problem with this IPA injunction is that it's undisputed that the practice group made $300,000 a year off this contract. There was adequate legal remedies in the form of money damages. Nobody disputes that. The plaintiffs don't really rebut that in their briefs, and that's black letter law that you can't have injunctive relief where money damages are adequate. And the last issue that we had with Judge Pantley's ruling is, I think she said it best to embody what she thought, is that irreparable harm is not a balance sheet. And so what this issue gets to is whether the plaintiff's profitability is relevant to the issue, whether there's continuing and irreparable harm. And, again, that's why I mentioned at the outset that we got done with the preliminary injunction essentially a year after my clients left the practice group. So MPC did have a track record of profitability or lack thereof to submit to the court to show that, hey, we've been really hurt by what my clients did to them. And, in fact, the evidence that we were able to glean showed that MPC had six offices before my client left. They still have six offices to this day. They really weren't hurt. So I think we were inhibited in presenting our defense to irreparable harm by showing that MPC was, in fact, profitable. And the ABC transport case that's cited by both sides, actually, in that case, the court ultimately denied a permanent injunction because the plaintiff had been profitable by that time, they tried the permanent injunction case, and there was no continuing irreparable harm. So for those reasons, we ask that the court reverse the trial court, that the court finds the privileges restriction to be ambiguous and unenforceable as a matter of law, that the court finds that the Halahan Employment Agreement was not extended and, therefore, terminated, and that the court reverses the injunctions that flow from the Halahan Employment Agreement, that the court finds that the IPA injunctions and the MPC patient injunctions are too vague and overbroad to be enforced. And, ultimately, as a fallback, we ask that the court, if it's not willing to grant that relief, that it does remand so the trial court can take evidence about MPC's profitability and we can develop that evidence through discovery. Just to give some context, if you look at the record, our appendix, base number 16, this is where Judge Pantley, the trial court, enters her injunction. We're specifically attacking injunction A, the IPA injunction, injunction D, the MPC patient injunction, injunction F, the privileges injunction, and injunction G, where Dr. Halahan is prohibited from practicing within five miles or three years under his employment agreement because we say it was terminated. Thank you. Thank you, Mr. Lang. Mr. Hollander. Thank you. I'm just going to jump ahead a little bit here. I just want to correct one thing, and Mr. Lang would never purposely mislead you. I know that. I think he forgot they did do a motion to reconsider on the scope of the patient's injunction. And what happened, he is correct, they immediately filed a notice of appeal, and then they filed a motion to reconsider. And I did argue that the trial court no longer could reconsider the order once the defendants had appealed the order. And Judge Pantley said, you know, even if I wanted to reconsider this, I don't have jurisdiction anymore, and did deny the motion to reconsider. So that did happen, for what it's worth. Getting to the point of this, the conduct that gives rise to this case from these defendants includes while Dr. Halahan was an employee, while Dr. Aquat was an employee, officer, director, in essence a partnership with Dr. Berniska, the defendants solicited 80 to 100 patients. They solicited key employees. They solicited this Northwest Suburban IPA contract, a $300,000 a year IPA contract. And as Judge Pantley found, Dr. Aquat used information he had as an officer, which was the capitation rate. Each member of this IPA was charged, or I should say, NPC was paid a monthly capitation rate. It was 65 cents per patient. Dr. Aquat, while he was still an officer, director, and employee of NPC, secretly contacted the president of Northwest Suburban IPA and underbid NPC. They did it for 55 cents per patient. Those facts, how is that relevant to the four issues that the appellant is raising? Well, the issues the appellant is raising, one of them, they're confusing. You know, we really have two distinct injunctions here. One of these is the defendants repeatedly breached their fiduciary duties in an outrageous way. All the cases I rely on, Dowd, you know, ABC Transnational, where there were injunctions without there being restrictive covenants, those people look like choir boys compared to the defendants here. All this just invasive wrongful conduct that the defendants did here. So this conduct is relevant to when Judge Pantley said you start treating patients, you started your business, you had NPC employees doing work for you, you did all these things, you can't treat the patients now. Okay, so but is that, in entering that kind of order, can the judge do so without any kind of geographic or temporal restriction? Irrespective of the covenant. We were talking this was just horrendous conduct, you're saying. Right. And in order to stop the breach of fiduciary duty that transpired, the court is entering an injunction. And they're saying you can't treat anybody ever until I say otherwise. The answer is yes, and that's what usually happens. So if we just set aside the other half of this injunction, which is the injunction based on the restrictive covenants contained in Dr. Hallahan's employment agreement, let's assume that never happened. So we're dealing with ongoing breaches of fiduciary duty. There's a preliminary injunction entered to enjoin it. How long does that preliminary injunction last? One of your questions. It lasts until the trial. The very purpose of a preliminary injunction is to maintain the case, prevent irreparable harm until the court can hear the merits of the case at trial and then decide what to do. ABC Transnational, we rely on the first case, which was the preliminary injunction case. That's what they did. They rely on the second ABC Transnational, which was upon trial in a permanent injunction where the court found the damages only lasted 30 days. So this is typical. Well, how do we – the judge in making the decision on the injunction, she wrote an opinion and gave the opinion there. Right. You know, you're arguing the injunction is there based upon the conduct of the breach of fiduciary duty without looking at the restricted covenants. Part of the injunction. And he's saying, oh, she looked at the restricted covenants, and that's why she wrote it. How do we make – is that – maybe that's not what he's saying. I don't even think he's saying that with all due respect. Okay. So you're saying that the court – what the court has done really doesn't – if you can take away the restricted covenants, you don't even have to look at that because everything is – this would be upheld based upon the breach of fiduciary duty. Part of the injunction, the patient prohibition and the Northwest Suburban IPA prohibition have nothing to do with the restrictive covenant. It deals with ongoing breaches of fiduciary duty. They solicited the Northwest Suburban IPA contract while they were still fiduciaries. She stopped them from doing that. Like any other injunction, preliminary injunction. So – but the IPA, which isn't really in contention. Well, they're trying – they're asking you to reverse the Northwest Suburban IPA injunction. Right. But that's not with regard to the restrictive covenant. Right. Right. Those are separate. The other part of the preliminary injunction is based on the restrictive covenants. It just goes to Dr. Hallahan, and that has a three-year temporal limitation. And to be clear, the defendants argued to Judge Pantley that that provision was ambiguous. I didn't. But they did, and Judge Pantley agreed, and that's how the hearing came about, where the judge followed the law and took parole evidence on the intention of the parties. Because contra preferendum is the last resort. First you determine the intention of the parties. Do you have a case, though, that says that in a case where there are no terms in there, rather than – that you can add terms rather than maybe rewrite the contract and reduce what terms are there? Judge Pantley didn't add terms to the contract. The way she interpreted this, when they said it was ambiguous, whether the three years applied. And the three years appears twice in that provision. In the two other sentences, but nonetheless. It's like bookends, this sentence. So the question was, did they intend the three years to also apply to the privileges restriction? Judge Pantley took evidence. Dr. Berniska testified that it did. Drs. Hallahan and Aquat testified at the hearing, and neither one of them took issue with that. Now, I don't know how Dr. Hallahan could. Dr. Hallahan clearly testified that he never intended to be bound by the restrictive covenant and just, you know, a really interesting, unusual fact in this case is the defendants, I say admittedly because they now admit that this contract existed, but admittedly perjured themselves. We filed this case June 28, 2010. June 29, 2010, both defendants filed affidavits averring that Dr. Hallahan never signed his employment agreement. He apparently forgot that three months earlier in a medical malpractice case against him, he produced and identified his signed employment agreement because that triggered insurance coverage for him. So the medical malpractice case, he had the employment agreement. In this case, never, and if you read it, I unequivocally state I never signed that agreement. I refused to at no time. And Dr. Aquat, who's right with him, Dr. Aquat kept the contract for NPC, filed his same affidavit, and the contract disappeared at the same time the defendants left NPC. The result of that was we got the initial TRO, which was the basic, the patient, and the Northwest Suburban IPA injunction, and Judge Pantley, being very careful in this case, giving them every benefit of the doubt, said, I can't enter a TRO based on you telling me that the employment agreement was signed and them denying it. It's a contested issue. We've got to have a preliminary injunction hearing. When we found the contract, and that was we got Dr. Hallahan's deposition from the medical malpractice case, we went back in, as Mr. Lang mentioned to you, and we asked that Judge Pantley expand the TRO. She said, no, we've done all this discovery. Let's have the preliminary injunction hearing, and we'll address this at the preliminary injunction hearing, which she did, and as was mentioned to you, in January of 2012, expanded the preliminary injunction and finally enforced the restrictive covenants against Dr. Hallahan. So what was the effect of that? It's a three-year prohibition for 19 months, I believe, from June 2010 to January 2012. Dr. Hallahan wasn't bound by restrictive covenant. He practiced at the hospitals he agreed not to practice at. He and Dr. Aquat purchased an office condominium, bought another, rented another office, and Dr. Hallahan practiced medicine within five miles of one of the NPC offices, contrary to the terms of his restrictive covenant. For the key time after they left, the first year and a half, Dr. Hallahan was absolutely free to violate his restrictive covenant, and he did. We didn't get that benefit from the restrictive covenant. It's really hard to have sympathy for the defendants to say something unfair was done to me in this case when they benefited from the perjury and they were allowed to illegally compete with NPC for a period of time. The ambiguity, and Judge Pantley found that the three years applied to the entire restrictive covenant. That was the intention. She heard evidence, which she's supposed to do. She found Dr. Berniska to be credible, and nobody contradicted his testimony. I don't know what choice there is. What about on the employment agreement, the nod of the head? He said that your client said there wasn't any. There is no question that Dr. Hallahan and Dr. Berniska agreed that the employment agreement would be extended by mutual assent, which is specifically allowed in the employment agreement. The defendants are making the issue, well, was that extended within the three years? But Dr. Hallahan clearly understood it was extended because in April and May of 2010, more than three years after he signed the contract, he sent these letters to Dr. Berniska and said, I'm leaving. I complied with my obligations under my employment agreement. And, again, he didn't testify at the trial to dispute Dr. Berniska's testimony that they had agreed to extend the employment agreement. It, again, was a non-disputed issue, so now the defendants are saying, well, you had to have extended the employment agreement before it terminated. There is no law to support that, none. And the cases they cite, they cite two cases where one law firm prepared employment agreements, restrictive covenants for medical practices. In both instances, the agreement said, here's the terms, and the restrictive covenant survives the termination of the agreement. In one case, the agreement was terminated. There was no clause in the agreement for an extension, as we had here, and the party admitted an oral argument in the appellate court that there was no agreement to extend the contract. Their argument simply was five years after the agreement terminated, because the language said the restrictive covenant survives termination of the contract, that kicked in the restrictive covenant five years after, admittedly, the contract was terminated. That has nothing to do with this case. The other case, Bieslaw, the court's ruling was simply, it was basically the same contract from the same lawyer. The court ruled that the medical practice had committed two material breaches of the employment agreement, including refusing to give the doctor the promised equity he was supposed to get in the medical practice. And they said, you can't enforce a contract that you've materially breached. And that was the basis for that decision. So there's no law saying the extension has to be entered before the contract runs by its terms. There's no dispute that there was an agreement to extend the contract. The specific question that they're referring to from Dr. Berniska was, did you mention the words employment agreement when you agreed to extend this? And he said no, because his testimony was, he said, you can be a partner. If you're not a partner, you can continue on under the same terms that you're going here. And Dr. Hallahan ultimately decided to continue under the same terms. They didn't say the magic words, employment agreement, but they said you're going to continue under the same terms and conditions. Respectfully, I believe even if we had to extend the agreement within its terms, that that satisfies that. I also want to emphasize the ambiguity here has nothing to do with the prohibited conduct. The privileges restriction says that Dr. Hallahan can't hold privileges, he has to resign privileges at any medical facility where any other NPC doctor holds privileges at the time Dr. Hallahan's employment with NPC is terminated. We pled in our complaint the medical facilities where existing NPC doctors had privileges, and Dr. Hallahan admitted that those were the facilities. So as far as the prohibited conduct from the restrictive covenant, there's no ambiguity. He knew he couldn't hold privileges at these facilities that he refused to resign privileges from. But what I don't understand is if she had a hearing to talk about the five miles and three years, why would you have that hearing if you knew what the facilities are in all these facilities? There's something that doesn't make sense. No, the hearing and the ambiguity was how long that privileges restriction was intended to last. But I thought she found both the geographic as well. No, absolutely not. Just the three years. Absolutely. And I have to point something out. The reply brief at page two, the defendants, what they're trying to do, here's what happened at trial. With Dr. Berniska's testimony, they asked him repeatedly, was the three years limitation supposed to apply to the privileges restriction? And he said yes. And again, Judge Pantley found him credible and accepted that. At one point, Dr. Berniska said, and we have the five mile restriction. And Mr. Lane objected that the answer was nonresponsive, and the judge said, just answer the question. So Dr. Berniska was reminding Mr. Lane that there was also a five mile restriction. So at the reply brief of defendants at page seven, they set forth questions and answers, purportedly where this so-called admission was made. And they leave out, they edit out the question that Dr. Berniska actually answered. And based on your interpretation, this five mile radius applies to the privileges restrictions. The answer is that is what it says, yes. They leave out the interim question. It says of the offices or any office of the corporation, is that correct? That is what it says, yes. So the way they edit that question and answer in the reply brief completely changes the meaning of Dr. Berniska's answer. Dr. Berniska never testified the five mile limitation applied to the privileges restriction. Judge Pantley heard the testimony, and Judge Pantley ruled that it didn't apply. She said it's just the three year limitation. What Dr. Hallinan is doing is again trying to avoid his restrictive covenant and get this court to say you only have to resign your privileges or we're only going to affirm the injunction to the extent of two of the medical facilities that also happen to be within five miles. If you read that restrictive covenant with all due respect, there is no way that five mile provision applies to the privileges restriction. Judge Pantley was correct. There's no basis in this record to reverse her on that finding. Anyhow, the ambiguity is only to the length. There's no ambiguity as to what Dr. Hallinan is prohibited from doing. Then I consider her argument having some legs, although I would call the court's attention to cases which cite total health physicians. In that case, the prohibition was that the doctor couldn't practice in any county in which the corporation is operating. Completely ambiguous and the appellate court said here's how we reasonably interpret is operating and they set the guidelines for where the doctor couldn't practice. There's a case of an ambiguity in the prohibited conduct and the appellate court still said it was enforceable. This follows a long line of cases. You asked if there was a geographic restriction. I'm sorry, just getting to that now. With the privileges restriction, let's take one example, Sherman Hospital. The restrictive covenant requires Dr. Hallinan to resign privileges at Sherman Hospital. The defendants argue, well, there's no geographic limitation to that, so it's overbrought. There is. It's Sherman Hospital. It's one place he has to resign privileges. Other than the other restricted facilities, he can go get privileges at any other medical facility within this state. The geographic limitation is Sherman Hospital. So here we have, I think it's four or five hospitals and four or five surgery centers where he had to resign privileges. There is a geographic limitation. He just has to resign there. Go get privileges wherever else you want. He had opportunities. He had offers from two other podiatrists when he decided to leave NPC where he admits he could have practiced podiatry in the state of Illinois, in the Chicago area, and not violated the geographic limitation of the restrictive covenant he signed but didn't intend to be bound by. He chose to violate the terms of the restrictive covenant by opening this office with Dr. Aquat. I know I'm running out of time. If I could just find a – I think there's a couple other key points I wanted to make. For the reasonableness of the restrictive covenant, as Judge Pantley interpreted it, as resolve the ambiguity, that is limited to three years. And this is really a unique argument from the defendants. Typically, a defendant would argue my restriction is more narrow than what a judge found. I don't have to avoid doing all these things. Dr. Hallahan argued in the trial court for the broadest possible interpretation of the privileges restriction. They argued there is no limitation on it. It's forever. And since they say I can't hold privileges at these hospitals forever, it's too broad and you can't enforce this provision. And Judge Pantley said, I agree with you. It's ambiguous. Let's figure out what everybody intended, took the evidence, decided it was three years. Is a three-year privileges restriction reasonable and enforceable? That's really the issue on that. Mohanty, an Illinois Supreme Court decision, is a virtually identical provision. I think it was clear that this provision was modeled after the Mohanty decision. It's the same provision, basically, except it's for a period of five years. And the Supreme Court said that's reasonable. We cited other cases. We have the five-mile radius restriction where Dr. Hallahan can practice podiatry. We cited cases up to a 25-mile radius where a doctor was prohibited from practicing. So the terms of the agreement are certainly reasonable. The part of the injunction that doesn't involve the restrictive covenant, which is the patient restriction and the Northwest Suburban IPA restriction, is any other injunction based on breaches of fiduciary duty or other torts. And the defendant's case, the ABC, says that the restrictive, because the fact that the parties didn't have restrictive covenants has nothing to do with an injunction based upon torts committed by the defendants. And that's the same here. Those torts that they committed, the ongoing breach of the fiduciary duties, although it's a hybrid, maybe not a tort, but the point is a common cause of action, that's intended to be in place until the hearing on the merits, which we're shooting for this year. That's fine. I mean, but that's it. I'm not aware of a court without a restrictive covenant limiting the time period for competition saying I'm entering a preliminary injunction, but it's going to vacate somehow before we have a hearing on the merits in this case, before we have our trial in this case. I just don't think that's done, and I don't think that's the purpose of the preliminary injunction hearing, is to keep everything the same and avoid the irreparable harm until you have the opportunity to have the trial. And the last thing, if I can mention one more thing, the argument that we didn't prove damages. The very purpose of the injunction is to prevent damages. The case law says you don't have to prove damages when you get the injunction to prevent the damages before they ever occur. And in this case, as Mr. Lang told you, we had the temporary restraining order entered the day, effective date of the resignations of Drs. Aquat and Halahan. So from day one, we limited their competition. Now they want to go in and say, well, what were your damages? Well, we reduced our damages because we were proactive and we received the temporary restraining order that prohibited. They were going to do this wholesale stealing of the patients. They started it while they were still associated with NPC. We prohibited that. So if that was relevant to the preliminary injunction case, then we would be punished for our diligence in getting the temporary restraining order prohibiting damages, and then that would be a basis for us not to get a preliminary injunction because we came in so promptly to limit the damages. We all know the elements, I believe, of what's necessary for a preliminary injunction. One of the elements is not proof of damages or proof that you're no longer profitable, irreparable harm, et cetera. And we don't have to prove our case. We have to show we have a proper basis for each one of those elements pending the trial. And in this case, I would respectfully submit we proved each of the elements for a preliminary injunction. If at trial there's no damages, then the court can deny a permanent injunction if there's no ongoing damages. But really that's a separate issue from the preliminary injunction. So we ask that you affirm the trial court's injunction order in its entirety, and thank you. Thank you, Mr. Holland. Mr. Lange, brief rebuttal. I don't believe we filed a motion to reconsider. We filed a motion to stay where that issue came up, but the record will bear that out. One of the problems we have with the way the trial court enforced the privileges restriction is that the trial court basically said we're going to borrow the time limitation from the first clause and supply that term onto the second clause. So to get to Justice Hyman's question, that really was blue penciling that the trial court did right there and then. And then to compound the problem, the trial court only took the time limitation but not the geographic limitation. So basically the trial court said, look, it's in this agreement, the time limitation, and we can put some reasonable restrictions on the privileges restriction by looking at other clauses in the agreement, but she only applied half of the equation. Dr. Berniska, when we asked him at trial cross-examination, is your position that this language from the first clause applies to the second clause? He said yes. That's what he was doing. But again, the judge only went halfway. The law doesn't make a distinction when you're talking about restrictive covenants between a good ambiguity and a bad ambiguity. If there's an ambiguity, we're not going to force the agreement. The total health case was not an ambiguous. There's no claim that there was an ambiguous restrictive covenant there. And counsel claims that there's no ambiguity as to the conduct that's enjoined. But when you look at the injunction, it orders my client to resign his privileges without any time limitation, not even the three years. Does that mean that he can reapply or can't reapply once he resigns? It only says that he resigns. So there's ambiguity right then and there as to the conduct. So I disagree with counsel's premise there. As to the NPC patient injunction and the question as to whether you can have an open-ended 35-year injunction, essentially, the law says that injunctions, just like restrictive covenants, cannot be too vague or too overbroad. So going back to my example as to a patient that saw NPC in 1978 and tries to see my clients today, the law would say that's unreasonable. Also, the Wilder case, again, it restricted the oral restrictive covenants to trade secrets protection, which is not at issue here. Talking about the evidence of profitability, and counsel claims that his clients were punished for their diligence. Well, the ABC transport case, I think, said it best. It said that the granting of the injunction would disrupt the defendant's business while not substantially benefiting the plaintiff who conceivably is profitable. It should be emphasized that the fortuity of the plaintiff's survival and current profitability does not excuse the wrongful conduct. So to say that it's unfair that we are getting away with this because they're profitable, the court addressed this. It is a factor, however, to consider in determining whether the prerequisites for injunctive relief exist at this time. We find that the element of irreparable injury is no longer present in any real sense. Plaintiff's injuries can be compensated adequately in damages. So we sit here three years later. We can see the impact of my client's alleged conduct on the business. We can look at the balance sheet at this point. The normal preliminary injunction case comes on the heels of a TRO, and normally it's done within two or three weeks of the TRO. Here the preliminary injunction was done a year later. There was evidence of profitability that the plaintiff's had that we didn't have that went directly or would have went directly to continuing irreparable harm, and we are undercut under the case law by not being able to address it. And counsel in his argument didn't even address that there's no dispute here that there's adequate legal remedies as to that IPA injunction. They were definable in revenues of $300,000 per year. So for that we ask for the relief they asked for the first time around, and also I note that this court at this point could dissolve the injunction too in addition to the relief of reversing the trial court as we asked. Thank you, Mr. Lange. Thank you. I want to compliment you, Mr. Lange, and Mr. Hollander on your arguments and on the briefs. This matter will be taken under advisement, and this court stands in recess. Thank you.